### HORNE v. THE JOHN I. BRADY.

(Circuit Court of Appeals, Fifth Circuit. April 12, 1913.)

No. 2,346.

COLLISION (§ 95*)—STEAMER AND TUG WITH TOW MEETING IN NARROW CHANNEL—VIOLATION OF RULES.

A collision between a loaded steamer outbound and a barge in tow of a tug passing up the Port Arthur Ship Canal *held* due to the fault of both steamer and tug for various violations of the rules governing meeting vessels in narrow channels; the tug also being in fault for entering the channel before the steamer, which was already in the channel, had passed through, in violation of the rules, and for not using a bridle on her tow, as she should, in view of the narrowness of the canal, which was only from 75 to 100 feet on the bottom.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeal from the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Suit in admiralty by P. Horne, master of the steamship Edward Dawson, against the steam tug John I. Brady and barge Harry Morse; the Texas Company, claimant. Decree for respondents, and libelant appeals. Reversed.

This is a suit in rem to recover damages suffered by the steamship Edward Dawson in a collision with the barge Harry Morse and steam tug John I. Brady about 1:45 p. m., June 9, 1909, in the Port Arthur Ship Canal, a narrow channel about seven miles long, running from Sabine river, above Sabine Pass, to Port Arthur, Tex. This canal was constructed along the west bank of Sabine Lake in a northwesterly direction, with some bends

of more or less length, and with one long bend from Mud Bayou to half way between Keith Lake and Round Lake and with a width of 200 feet, with sloping banks, leaving the width on the bottom of from 75 to 100 feet, with a depth of about 23 feet at low tide. The tides are small and irregular; the rise and fall of the sea being much affected by winds. Navigation on this canal is controlled by the pilot rules for the rivers whose waters flow into the Gulf of Mexico and their tributaries, adopted by the Board of Supervising Inspectors February 13, 1907, approved by the Secretary of Commerce and Labor February 25, 1907. The following are pertinent in this case:

"Rule I. When steamers are approaching each other from opposite directions, the signals for passing shall be one short and distinct blast of the whistle to alter course to starboard so as to pass on the port side of the other, and two short and distinct blasts of the whistle to alter course to port so as to pass on the starboard side of the other.

"When two steamers are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other.

"When an ascending steamer is approaching a descending steamer, the pilot of the ascending steamer shall give the first signal for passing, which shall be promptly answered by the same signal by the pilot of the descending steamer, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending steamer deems it dangerous to take the side indicated by the ascending steamer, he shall immediately signify that fact by sounding the alarm or danger signal of four or more short and rapid blasts of the whistle, and it shall be the duty of the pilot of the ascending steamer to answer by a signal of four or more short and rapid blasts of the whistle, and the engines of both steamers shall be immediately stopped, and backed, if necessary, until the signals for passing are given and answered. After sounding the alarm signals by both steamers, the pilot of the descending steamer shall indicate by his whistle the side on which he desires to pass, and the pilot of the ascending steamer shall govern himself accordingly, the descending steamer being entitled to the right of way.

"Where possible, the signals for passing must be made, answered and understood before the steamers have arrived at a distance of half a mile of each other. * * *

"Rule III. When two steamers are about to enter a narrow channel at the same time, the ascending steamer shall be stopped below such channel until the descending steamer shall have passed through it; but should two steamers unavoidably meet in such channel, then it shall be the duty of the pilot of the ascending steamer to make the proper signals, and, when answered, the ascending steamer shall lie as close as possible to the side of the channel the exchange of signals may have determined, as provided by rule I, and either stop the engines or move them so as only to give the boat steerageway, and the pilot of the descending steamer shall cause his steamer to be worked slowly until he has passed the ascending steamer."

There was some evidence of a rule of the canal that speed was limited to four miles per hour. The Edward Dawson, of the length of 265 feet and 37 feet beam, was outward bound from Port Arthur, with a cargo of oil, and drawing 18 feet forward and 22 feet 3 inches aft. The barge Harry Morse, having a length of 198 feet 2 inches, beam 37 feet 5 inches, without cargo, and drawing from 11 to 12 feet, was in tow astern of the steam tug John I. Brady, 96 feet 8 inches in length, beam 21 feet, drawing 9 feet 4 inches, on a hawser about 50 fathoms in length, and was in Sabine Pass bound for Port Arthur.

About 12:40 p. m., June 9, 1909, the Dawson entered the canal at Port Arthur bound down the canal to sea. At that time the steamship Northwestern was in the canal going up to Port Arthur, and about the same time the tug Brady, with the Harry Morse in tow, entered the lower end to proceed up the canal to destination. The Dawson passed the Northwestern, and then, if not before, the Dawson was fully advised that the Brady, with the Harry Morse in tow astern, was ascending the canal. The Dawson kept on her course down the canal at slow speed, eventually stopping along the

west bank near, if not at, the head of the long bend, ending a short distance above Keith Lake, and there waited for the Brady and tow to pass.

The evidence of the Dawson's officers is that the engines of the Dawson were stopped, and that she made no headway down the canal; but the undisputed fact is that a slow tide was then running up the canal, and the Dawson could not have remained stationary along the bank, unless enough engine movement and headway were maintained to meet the tide, and all this makes it uncertain as to the exact place that the Dawson held the west bank for the Brady and tow to pass, and which was the actual place of collision. As the Brady and tow approached the Dawson and within regulation distance she blew one whistle, and the Dawson answered by one whistle. This was an assent that the vessels should pass port to port.

From this time the only material and undisputed facts to be gleaned from the pleadings and evidence are that the Brady cast off the hawser towing the Morse just before the Morse and Dawson collided, and that the Morse's port anchor a-cockbill at the port cathead raked the port side of the Dawson from forward nearly to stern, inflicting great damage, and finally making fast with the anchor in the after bulkhead of the Dawson.

F. D. Minor and Geo. C. Greer, both of Beaumont, Tex., for appellant.

John W. Griffin, of New York City, for appellee.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). The libelant and appellant charges negligence on the part of the Brady and Morse:

"In entering the southern end of said Port Arthur Canal whilst the steamship Edward Dawson was already in said canal descending the same; in failing to lie as close as possible to the eastern bank of the canal while the Edward Dawson passed them; in towing by the steam tug John I. Brady of the barge Harry Morse by too long a scope of rope; in the towing of said barge on a single hawser, instead of on a double hawser, and without a bridle, and in not having said barge lashed alongside of said steam tug; in the great speed at which the said tug was towing the said barge Harry Morse, and in permitting the port anchor of the barge Harry Morse to hang or swing loose at the cathead, instead of being secured fast there, or at the hawsepipe; and in the want of skill and in the improper conduct of the persons navigating the said steam tug and barge in not taking the necessary further steps to prevent said collision."

The claimant, denying all negligence on the part of the Brady and Morse, alleges:

"That the officers and crew of said steamship Dawson were not skillful or competent, were not attentive to their duties, but proceeded with said steamship in a careless, reckless manner. That her officers and crew were not properly stationed, and were guilty of gross recklessness in entering said canal when by the exercise of ordinary diligence they could have seen that the steamship Northwestern and the tug John I. Brady and barge Harry Morse were already in said canal on their way to the Port Arthur basin, at the head of said canal wherein said steamship was then lying. That as the said steamship Edward Dawson was heavily loaded, and drew the full depth of navigable water in said canal, she could not be steered on a straight course, but because of her 'sucking' and 'smelling bottom' she steered wildly. Hence it was dangerous to bring such a vessel into the canal, while other vessels were navigating it, which she was bound to meet, if she entered; and it was gross negligence to continue on with said steamship through a straight reach to pass said towboat and barge in a bend, which she attempted to do,

because such a passage is more difficult than in a straight reach. That it was negligence to continue under way, and to run so far over to the west bank as to cause her to strike the incline bank and sheer over to the east bank and into the barge, and thereby occasioning the collision complained of in this cause."

The evidence in the transcript is unusually conflicting, even for an admiralty case, and it is useless to try to reconcile it on all the material issues. Res ipsa loquitur, and a few undisputed and preponderantly proven facts, however, point to a just conclusion.

1. As to entering the canal: The Dawson, entering the canal when the Northwestern was ascending, violated the spirit, if not the letter, of the navigation rule:

"When two steamers are about to enter a narrow channel at the same time, the ascending steamer shall be stopped below such channel until the descending steamer shall have passed through it"

—for the reason underlying is the danger to be avoided of two steamers passing in such narrow channel. The weight of the evidence is to the effect that the Dawson, the "descending steamer," was not only about to enter the canal, but had actually entered before the Brady and Morse entered at the lower end; and so we conclude that the Brady and her tow violated the letter and spirit of the said rule. Finding these violations, however, does not necessarily decide this case, for while leading up to and making the collision possible they were not the necessary and proximate cause of the same.

2. The said rule further provides:

"But should two steamers unavoidably meet in such channel, then it shall be the duty of the pilot of the ascending steamer to make the proper signals, and, when answered, the ascending steamer shall lie *as close as possible to the side of the channel the exchange* of signals may have determined, as provided by rule I, and either stop the engines or move them so as only to give the boat steerageway, and the pilot of the descending steamer shall cause his steamer to be worked slowly until he has passed the ascending steamer."

The undisputed facts are that the Brady, as the ascending steamer, signaled to pass port to port, and the Dawson answered, assenting, and then both parties reversed the rule. The Dawson went to the right bank to remain, while the Brady and her tow kept on ascending the canal. Reversing the rule was a violation thereof by both parties, and though it led up to the collision it did not really compel it.

3. In maneuvering to pass, the Dawson, following the understanding, as we find the weight of the evidence, took the right bank to *lie as close as possible,* very near to the head of the long bend which runs from Mud Bayou up above Keith Lake, if not actually in it, instead of taking, as she ought, the straight reach above. The Brady rounded the head of the bend and had nearly passed the Dawson, while the Morse, following, took a sheer over towards the Dawson, and this was followed by the Morse colliding with the Dawson, just prior to which, when the Brady should have pulled its best, the master of the Brady threw off the hawser, leaving the Morse without motive power and under strong headway to take care of herself.

There is unanimity among claimant's witnesses to the effect th.t the Dawson was well inside the bend, and was under headway and zigzagging in the channel, and that she actually ran down and into the Morse, while the latter only made a little sheer to port, caused by touching the bank; but all this is substantially met by the evidence of the officers of the Dawson, supported by the strong presumption that the pilot and master of the Dawson could not have intended, nor even wished, to run down the Morse.

4. It was not negligent for the Brady to tow the Morse astern, instead of abreast and lashed alongside. In the narrow channel of the Port Arthur Canal, and where, according to the evidence in this case, nobody appears to pay any attention to the navigation rules, it was probably best to tow the barge astern; for, with vessels of the length and beam herein involved, the three abreast would take up 95 feet 5 inches of actual beam, and a passage even in a straight reach of the canal would be very hazardous.

When towing astern, when other vessels are at the time likely to be using the canal, a hawser with a bridle—or, better, two hawsers—should be used. Nor was it negligent for the Morse to carry her port anchor a-cockbill at the cathead. In those waters it was proper, if not necessary, to carry a large anchor, necessary for quick letting go in an emergency. Inboard it would take time to get it out. Hanging at the hawsehole, it would probably impede navigation. The evidence tends to show that both parties violated the canal rule limiting speed.

On the whole case, we find that in the collision between the Dawson and the Harry Morse both vessels were in fault. The Dawson has made proof, to the satisfaction of the judge of the lower court, of damages amounting to $12,532.05; but the claimant contends that they are exaggerated, and that no good opportunity has been given to contest them. The claimant in his answer avers that the Morse suffered damages in the collision amounting to over $400. Following the usual rule in collision cases, where both parties are in fault, the damages must be divided, and a reference follows, if damages are not admitted.

For all the foregoing, the decree appealed from is reversed, and the cause is remanded, with instructions to enter a decree finding both libelant and claimant in fault, and dividing the proven damages equally, and thereafter to proceed according to established admiralty rules and usages. The appellee to pay the costs of this court.